*Formatted for Electronic Distribution*                          *Not for Publication*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

In re:

      **Theodore J. Mayo, Sr.**                       **Chapter 7 Case**
              **Debtor.**                        **# 04-11106**

_____

**Trustees of the Iron Workers**
**District Council of New England Pension,**
**Health and Welfare, Annuity, Vacation, and**
**Education Funds, and**
**International Association of Bridge, Structural,**
**Ornamental and Reinforcing Iron Workers,**
**Local 474, AFL-CIO**                       **Adversary Proceeding**
              **Plaintiffs,**                   **# 04-1067**

    **v.**

**Theodore J. Mayo, Sr.,**
              **Defendant.**

_____

| *Appearances:* | *Kathleen Walls, Esq.* | *William W. Cobb, Esq.* |
| --- | --- | --- |
| | *Middlebury, VT* | *Hyde Park, VT* |
| | *Attorney for Plaintiffs* | *Attorney for Defendant* |

## MEMORANDUM OF DECISION
### GRANTING, IN PART, PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

On May 25, 2007, the Trustees of the Iron Workers District Council of New England Pension, Health and Welfare, Annuity, Vacation, and Education Funds, and International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Local 474, AFL-CIO (the "Plaintiffs") filed a motion for summary judgment (doc. # 178) seeking a declaration that the debt the Defendant, Theodore J. Mayo, Sr. ("Defendant" or "Mayo") owes to them should be excepted from discharge pursuant to §§ 523(a)(4) and (a)(6).[1] For the reasons set forth below, the Court grants partial summary judgment to the Plaintiffs; specifically, the Court declares that a portion of the debt arose from the Defendant's defalcation while acting in a fiduciary capacity under § 523(a)(4), and that the Defendant is not entitled to discharge that portion of the judgment.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding and the pending motions for summary judgment under 28 U.S.C. § 157(b)(2)(I).

---

[1]  All statutory citations herein refer to Title 11 United States Code (the "Bankruptcy Code") unless otherwise indicated.

## PROCEDURAL HISTORY

This Adversary Proceeding, and its related main case, have had a long and tortured history in this Court, which the Plaintiffs have cataloged in the Memorandum of Law they filed in support of their Motion for Summary Judgment (doc. # 178).[2] In November 2006, as a sanction for repeated failures to produce discovery, the Court issued an Order striking the Answer the Defendant filed in this adversary proceeding (doc. # 122). Subsequently, the Plaintiffs moved for and were granted a Clerk's Entry of Default (doc. # 132, amended at doc. # 143), and then moved for a default judgment against the Defendant in the amount of $187,053.12 (doc. # 133, amended by doc. # 141). On January 16, 2007, the Court held an evidentiary hearing and, on February 28, 2007, the Court issued an Order granting default judgment against the Defendant "with regard to the Debtors' liability for the Plaintiffs' claim, and the Debtors' objection to the Plaintiffs' claim. . ." The Court entered judgment against Debtor/Defendant Mayo for the sum of $208,537.22, which included amounts due for labor, based upon the hearing testimony, interest, and attorney's fees (doc. # 147).[3] On August 21, 2007, the Court issued an Order denying the Defendant's motion to vacate the order striking the answer as well as the Defendant's motion to vacate the default judgment (doc. # 191).

Given the specific terms of the Order granting default judgment, and Local Rule 7055-1(b), which provides that default judgment cannot be entered on claims arising under §§ 523 or 727, entry of the default judgment did not resolve the claims set out in the Plaintiffs' First Amended Complaint (the "Complaint") (doc. # 10): alleging that the Defendant's debt should not be discharged because the Defendant committed defalcation while acting in a fiduciary duty capacity and because the debt arose from a willful and malicious injury; or the consequential attorney's fees claim. To resolve these outstanding issues, the Plaintiffs filed the instant motion for summary judgment.  The Defendant filed papers in opposition (doc. # 184).

## BACKGROUND FACTS

Because the Defendant's Answer in this adversary proceeding was stricken, the Court admits the facts alleged in the Complaint as uncontested and true. However, where statements in the Complaint involve legal conclusions, those items cannot be admitted as true. See In re Industrial Diamonds Antitrust Litig., 119 F.Supp.2d 418, 420 (S.D.N.Y. 2000) ("While a default constitutes an admission of all the facts "well pleaded" in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action."). The allegations set forth in the Complaint are as follows:

---

[2] For additional statements of the pertinent procedural history, see the motion and order to strike answer (docs. ##  98 and 122), motion and order for default judgment (docs. ## 133 and 147), and the recent order denying the vacatur of these orders (doc. # 191).

[3] The default judgment was entered against Mayo in this adversary proceeding, and against defendants "Theodore Mayo and his alter egos Superior Steel & Precast Erectors, Inc., and Super Lift Crane Rentals, Inc." in adversary proceeding # 05-1063 (involving the same Plaintiffs as this case). The answers in both adversary proceedings had been stricken for cause and default judgment had been entered against both Mayo and Superior Steel for $208,537.22, and Mayo's objection to claim had been overruled (doc. # 147).

[1.]     On April 18, 2002, the Debtor signed a collective bargaining agreement ("CBA") with Local 474 which, among other things, required the Debtor, under the name o[f] Superior or of another name, or under the name of any other entity where the Debtor exercised direct or indirect management, control or majority ownership, to pay wages and benefits to employees who performed covered labor.

[2.]     Prior to the commencement of the instant Chapter 7 proceeding, the Debtor employed labor under the name Superior to perform covered work.

[3.]     Prior to the commencement of these Chapter 7 proceedings, the Debtor, upon information and belief, created an alter ego of himself and Superior called Super Lift Crane Rentals, Inc. to avoid obligations under the CBA. For example, upon information and belief:

   a.     Superior and Super Lift have the same business purpose, i.e., steel erection;

   b.     The two companies operated in substantially the same geographical area (VT & MA), and use substantially the same vendors, customers, equipment, management, operations and supervisors;

   c.     Super Lift has listed as an [sic] bookkeeper Lisa Mayo. Lisa Mayo is the Debtor's daughter.

[4.]     The CBA prohibits a sale or transfer of assets or operations to any successor without first obtaining a written agreement of the successor to assume the obligations of the CBA.

[5.]     Upon information and belief, on or about February 8, 2003, the Debtor fabricated a sale of his interest in Super Lift to Mr. Ben Wein.

[6.]     Upon information and belief, Mr. Ben Wein was a non-union employee of the Debtor.

[7.]     This purported sale was not accompanied by any written agreement to assume the Debtor's obligations under the CBA.

[8.]     Upon information and belief, the Debtor transferred Super Lift to Ben Wein for no consideration or pretextual consideration.

[9.]     The Debtor's action in creating Super Lift was intended to cause the Trustees and Local 474 injury or was substantially certain to cause the Trustees and Local 474 injury as his purpose was to deprive the Trustees and Local 474 of the monies they were due under the CBA.

[10.]    Upon information and belief, the Debtor has maintained, since its inception, indirect management, control, and majority ownership in Super Lift.

[11.]    Upon information and belief, prior to the commencement of the instant Chapter 7 proceeding, the Debtor employed labor under the name Super Lift to perform covered work.

[12.]    Respecting the labor employed under the name Super Lift, the Debtor failed to make required contributions to the Trustees.

[13.]    Respecting the labor employed under the name Super Lift, the Debtor failed to pay wages as dictated in the CBA and failed to make appropriate ERISA fund contributions to the Trustees.

[14.]   Upon information and belief, Super Lift and Superior are alter egos of each other and the Debtor, and have intermingled funds and other assets.

[15.]   On or about June 4, 2003, the union filed an action against the Debtor, Super Lift and Superior in the District Court, alleging violations of the CBA.

[16.]   On or about February 23, 2004, Super Lift filed for Bankruptcy protection under Chapter 7.

(doc. # 10). The Court admits all of these facts as true, except the following, which draw legal conclusions or conclusions based on intent: ¶¶ 3 and 14, to the extent that an "alter ego" is a legal conclusion; ¶ 5, to the extent that "fabricat[ion]" of a sale is a legal conclusion; and ¶ 9, to the extent that intention to cause injury and causing injury is a legal conclusion and a conclusion based on intent.

What makes this motion for summary judgment rather unique, and challenging to adjudicate, is that the "facts" in this case are facts deemed admitted by the striking of the Defendant's Answer (i.e., the facts alleged in the Complaint) and the facts that are undisputed and/or admitted in the motion for summary judgment. The parties have not developed a documentary or testimonial record with regard to the specific dischargeability issues now before the Court. Most of the statements in the Plaintiff's Statement of Material Facts ("Plaintiff's Statement") submitted in support of its motion for summary judgment mirror the facts asserted in the complaint, often providing more detail; only items 10 and 11, below, are new:

1.   On April 18, 2002, the Debtor signed a [Collective Bargaining Agreement, hereafter "CBA"] with Local 474 which, among other things, required the Debtor, under the name of Superior or of another name, or under the name of any other entity where the Debtor exercised direct or indirect management, control or majority ownership, to pay wages and benefits to employees who performed covered labor. The CBA also required that a sale of any such entities owned by the Debtor be accompanied by documents whereby the buyer would assume the obligations of the CBA.

2.   Prior to the commencement of the instant Chapter 7 proceeding, the Debtor employed labor under the name Superior to perform work covered under a collective bargaining agreement signed by the Debtor. The CBA, containing Mr. Mayo's signature has been entered into the record in this action. An additional copy is attached hereto as Exhibit A.

3.   Prior to the commencement of the case, the Debtor incorporated and owned Super Lift. The attached documents from the Vermont Secretary of State's office show that Super Lift Crane Rental was incorporated on February 11, 2003, and that the Debtor, as of April 2003 was the President and Director. Superior Steel, the Debtor's corporation, is listed as the registered agent. The corporate records are attached as Exhibit B.

4.   Superior and Super Lift had the same business purpose, i.e. steel erection.

5.   Superior and Super Lift operated in substantially the same geographical area (VT & MA), and use substantially the same vendors, customers, equipment, management, operations and supervisors.

6.   In February 2004, the Debtor transferred Super Lift to Ben Wein.

7.    Mr. Ben Wein was an employee of the Debtor covered by the CBA.

8.    A purported sale was not accompanied by any written agreement to assume the Debtor's obligations under the CBA and no money or any thing of value ever changed hands for the purported sale.

9.    Prior to the commencement of the case, the Debtor employed labor under the name Super Lift to perform work covered under the CBA.

10.   The Debtor was in control of the employee pension plans and had discretionary authority in the administration of the plans.

11.   The Debtor was responsible for determining which bills to pay and maintained only one bank account for business and personal use in the name of Superior Steel & Precast Erectors, Inc.

12.   Respecting the labor employed under the name Super Lift, the Debtor made no contributions to the Creditor Trustees.

13.   Respecting the labor employed under the name Super Lift, the Debtor failed to pay wages as dictated in the CBA and failed to make appropriate ERISA fund contributions to the Creditor Trustees.

(doc. # 178, Ex. 1).

The Defendant filed his own statement of undisputed material facts (doc. # 183, Ex. 1) (hereafter, "Defendant's Statement"). Because of the unusual posture of this case, the Court compares the Plaintiffs' and Defendant's Statements to glean what facts are relevant, material, and admitted in order to resolve this motion for summary judgment. With respect to the first fact set out by the Plaintiffs, the Defendant does not contest his signature on the pertinent documents, but he asserts, somewhat inconsistently, that those documents did not constitute a CBA, he signed them under duress, he was "never made aware of the terms and conditions" of the CBA, and he did not agree to the terms of the CBA. He also contends that the CBA had no legal force or effect, based on various theories of contract law. See id. at ¶¶ 1-2. In addition, the Defendant disputes: (1) Plaintiffs' fact # 4, and asserts that Superior Steel was in the business of steel erection and Super Lift was in the business or renting and leasing cranes; (2) Plaintiffs' fact # 5; (3) Plaintiffs' fact # 6, pointing out that the sale to Mr. Wein took place in 2003, rather than 2004; (4) Plaintiffs' fact # 7, denying that Mr. Wein's employment was covered by the CBA; (5) Plaintiffs' fact #  8, insisting that since Mr. Wein gave a promissory note for $10,000, "there was consideration for the sale"; and (6) Plaintiff's fact # 9, denying that he ever employed labor under the name of Super Lift. Id. at ¶¶ 4-9. However, because these facts have already been admitted as a result of the Defendant's Answer being stricken, the Defendant may not again bring them before the Court as contested facts on this motion for summary judgment.

In response to Plaintiffs' facts ## 10 and 11, the Defendant acknowledges that he controlled the employee pension plans of Superior Steel, had discretionary authority in the administration of those plans, and was responsible for and determined which bills to pay in connection with Superior Steel (see doc. # 183, Defendant's Statement and Mayo's Affidavit attached to opposition to motion for summary judgment). He

asserts that he had no such control or authority relating to the Super Lift plans, which were allegedly controlled by Mr. Wein. Id. at ¶¶ 10-11. In the same vein, he asserts that he had no obligation to the Creditor Trustees under the name Super Lift, nor did he have an obligation to pay wages or ERISA fund contributions under the name Super Lift. Id. at ¶¶ 12, 13. The Defendant adds that he maintained two checking accounts for Superior Steel to pay its bills. Id. at ¶ 11.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. A genuine issue exists only when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 247. Factual disputes that are irrelevant or unnecessary are not material. See id. The court must view all the evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmovant's favor. See Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992). In making its determination, the court's sole function is to determine whether there is any material dispute of fact that requires a trial.  See Anderson, 477 U.S. at 249; see also Palmieri v. Lynch, 392 F.3d 73, 82 (2d Cir. 2004).

## DISCUSSION

In their memorandum of law, the Plaintiffs argue in favor of summary judgment on two of the three counts included in their Complaint. They contend that the Defendant may not discharge the debt evidenced by the judgment in favor of the Plaintiffs because: (1) the debt arose as a result of the Defendant's defalcation while acting in a fiduciary capacity, pursuant to § 523(a)(4), and (2) the debt arose from the Defendant's breach of the CBA, which constitutes a willful and malicious injury of the Plaintiff, pursuant to § 523(a)(6). The Plaintiffs did not present any arguments regarding attorney's fees in their motion for summary judgment.

**I.      Attorney's Fees**

The default judgment (doc. # 147) awarded attorneys fees to the Plaintiffs in the amount of $27,279.22. Although a request for attorney's fees was included as the third count in their Complaint, the Plaintiffs did not include a section in their brief arguing the merits of this issue. Only in the "Wherefore" clause of their brief did they raise this issue; there, they ask the Clerk to "enter a judgment against the Debtor/Defendant Theodore Mayo Sr., for all counts alleged in the Complaint. . ." (doc. # 178). Courts typically do not consider claims if the claims have not been adequately developed in a motion or memorandum of law in support of that motion. See Yueqing Zhang v. Gonzalez, 426 F.3d 540, 546 n.7 (2d

Cir. 2005). Therefore, the Court finds it would be improper to award judgment on this count of the Complaint and denies the Plaintiffs' motion for a judgment that the attorney's fees are excepted from discharge. The attorney's fees awarded in the default judgment shall be discharged.

## II.    Defalcation While Acting in a Fiduciary Capacity

Count II of the Plaintiffs' Complaint alleges that the Defendant (a) "breached his obligation to segregate and pay contribution into the ERISA funds by unlawfully creating an alter ego to avoid the obligations," (b) "breached his obligation to segregate and pay contributions into the ERISA funds by unlawfully applying the funds withheld pursuant to the CBA," and (c)  "fraudulently withheld funds he deducted from employees' pay checks which were to be forwarded to the Trustees or Local 474, and by such conduct, he engaged in defalcation while acting in a fiduciary capacity" (doc. # 10, ¶¶ 29-31). In the "Demand for Judgment" paragraph in their Complaint, the Plaintiffs ask that "the Debtor be denied a discharge as to any and all debt owed by the Debtor to the [Plaintiffs] under 11 U.S.C. § 523(a)(6) and 11 U.S.C. § 523(a)(4), including debts characterized as debts being owed by Superior Steel, Super Lift, or any other corporate entity formed by the Debtor to avoid his obligations under the CBA. . ." (doc. # 178 at p. 6, emphasis added). In sum, the Plaintiffs have made clear that they are asserting claims based upon a defalcation while acting in a fiduciary capacity based on the Defendant's actions with regard to both Superior Steel and Super Lift.

In their memorandum of law in support of their motion for summary judgment, the Plaintiffs expand their defalcation arguments. First, they argue that the Defendant acted in a fiduciary capacity: (1) "with respect to the unpaid benefit contributions" (which Plaintiffs view as plan assets) that had been awarded to the Plaintiffs following the February 2007 hearing (involving Mayo and Superior Steel as defendants); and (2) when he commingled plan assets with the general assets of his corporation (doc. # 178, pp. 7-8). Next, the Plaintiffs assert that the Defendant committed defalcation with respect to the trust funds when he: (a) used the money that he was required by the CBA to withhold from employee wages and contribute to the Funds for personal and other business uses; (b) failed to make required distributions to the trust; and (c) failed to properly account for those funds (as he commingled them with other funds). Id. at pp. 9-10. The Plaintiffs add that the Defendant intentionally created an alter ego company to defraud employees, the Union, and the fund Trustees, and "engaged in a plan and scheme to hide funds assets from the Trustees." Id. at p. 10. In response, the Defendant simply asserts that "plaintiffs have offered no evidence – by way of affidavit or otherwise – to support their claim that defendant misappropriated funds or breached a fiduciary duty" (doc. # 183 at p. 5). In his affidavit, the Defendant conclusorily states that he "never mishandled any pension plans." (doc. # 183, Mayo Aff., ¶ 14).

Section 523(a)(4) of the Bankruptcy Code provides that:

(a)    A discharge under section 727 [and certain other sections of the Code] does not discharge an individual debtor from any debt –

7

* * *

    (4)     for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

The Second Circuit, in The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes), 183 F.3d 162 (2d Cir. 1999), described the "competing institutional policies" that frame this discharge issue, which include the defalcation exception here. Id. at 167.

> One of the primary purposes of the bankruptcy act is to permit [the honest debtor] to start afresh, a policy that is implemented through the discharge of antecedent debts. For this reason, exceptions to discharge are construed narrowly. Nevertheless, the fresh-start policy does not apply to all debts and debtors, and there are numerous Code provisions setting forth limitations on discharge. Some of the exceptions to discharge are evidently intended to deny relief to debts resulting from certain types of undesirable behavior.

Id. (internal quotations and citations omitted). In order to prevail on a claim pursuant to § 523(a)(4), the burden is on the party claiming nondischargeability, and that party must meet its burden by the preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 291 (1991).

With regard to the defalcation exception,

> [a] creditor must satisfy three elements in order to invoke the Section 523(a)(4) exception to the dischargeability of a debt. First, the debt must result from a fiduciary's defalcation under an "express or technical trust" involving the entrusting of money or other property to a fiduciary for the benefit of another. Second, the debtor must have acted in a fiduciary capacity with respect to the trust. Third, the transaction in question must be a "defalcation" within the meaning of bankruptcy law.

Chao v. Duncan (In re Duncan), 331 B.R. 70, 77 (Bankr. E.D.N.Y. 2005) (citations omitted).

### A.    Did the Debt Arise in Connection with an Express or Technical Trust?

In this case, the Complaint can fairly be read as alleging that the various funds – for both Superior Steel and Super Lift – were covered plans under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 et seq., and that the Defendant's failure to contribute to those funds constituted ERISA violations. Because a statute may create a trust for purposes of § 523(a)(4), see Board of Trustees of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci), __ F.3d __, 2007WL 1891736 at * 3 (6th Cir. July 3, 2007), the first prong of the defalcation analysis concerns whether a statutory trust existed under ERISA.

In order to establish the existence of a statutory trust, the moving party must show "that property or money was entrusted to a 'trustee,' that a statute creates or identifies a 'fiduciary' duty, and finally, that the trust was in place when the defalcation giving rise to the debt occurred." Duncan, 331 B.R. at 77. Duncan goes into detail about how the language and legislative history of ERISA "suggest that Congress intended traditional concepts of trust law to be applied to cases brought under ERISA," id., and cites bankruptcy courts that have found that ERISA-covered employee benefit plans constitute trusts for purposes of § 523(a)(4), id.

at 78. Particularly relevant is ERISA's definition of the term "employee welfare benefit plan," as any fund:

> established or maintained by an employer or by an employee organization or by both, to the extent that such a . . . fund . . . was established or is maintained for the purpose of providing for its participants . . . through the purchase of insurance or otherwise (A) medical, surgical, or hospital care or benefits or benefits in the event of sickness, accident, disability, death, or unemployment, or vacation benefits, apprenticeship or other training programs . . .

29 U.S.C. § 1002(1). The Duncan Court found that the plan in that case was "well within the scope of an ERISA employee benefit plan," and was therefore an "express or technical trust that satisfied the first element of a 523(a)(4) nondischargeability action." Duncan, 331 B.R. at 80.

Although the evidentiary record is spotty (at best) in this case, the Plaintiffs have provided a copy of the "Acceptance of Agreements and Declarations of Trust," signed by Mayo, as the Employer, on behalf of Superior Steel, which in turn incorporated the Agreement between Northeast Contractors Association and Iron Workers Local 474 (the "Local Agreement") (doc. # 181). The Local Agreement required the Employer to make payments to the following funds: Welfare Fund, Pension Fund, Vacation Fund, and the Education Fund if an Apprentice Training Program had been established. Id. The Welfare Fund contributions were to be used to provide group life insurance, accidental death and dismemberment insurance, hospital, surgical and medical expense insurance, and temporary disability benefits. Id. The Pension Fund contributions were to be used to provide pension benefits to eligible employees. The funds provided for in these documents provided benefits for its participants in accordance with the definition of an ERISA employee welfare benefit plan. Accordingly, consistent with the broad meaning accorded employee welfare benefit plans by courts considering the issue, this Court finds that the CBA/Local Agreement constitutes an ERISA employee benefit plan and is therefore an express or technical trust. This finding satisfies the first prong of the defalcation dischargeability test.

**B.      Did the Defendant Act in a Fiduciary Capacity with Respect to the Trust?**

As to the second prong of the defalcation dischargeability test – whether the Debtor acted in a fiduciary capacity with respect to the trust – the Court must first examine whether the Defendant is an ERISA fiduciary and, if so, whether an ERISA fiduciary is also a fiduciary for § 523(a)(4) purposes. It is well-settled that even though the meaning of "fiduciary" is a matter of federal law, the "broad, general definition of a fiduciary, involving confidence, trust, and good faith, is not applicable in dischargeability proceedings under § 523(a)(4)." Zohlman v. Zoldan (In re Zoldan), 226 B.R. 767, 772 (S.D.N.Y. 1998). Rather, a person is a fiduciary under ERISA "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of the plan." 29 U.S.C. § 1002(21)(A). This definition is viewed "not in terms of formal

trusteeship, but in <u>functional</u> terms of control and authority over the plan." <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 262 (1993) (emphasis in original).

In the Defendant's Statement and Affidavit, he admits that he "was in control of the employee pension plans of Superior Steel, and had discretionary authority in the administration of the plans of Superior Steel" (doc. # 183). He also admits that he was "responsible for determining which bills to pay as said bills related to Superior Steel." <u>Id.</u> These two admissions satisfy the requirement that the Defendant must act in a fiduciary capacity because he both exercised discretionary authority and discretionary control respecting management of the plan, as well as had discretionary authority or discretionary responsibility in the administration of the plan. The fact that he disputes whether he exercised the same control or authority over Super Lift's plan is irrelevant because the Plaintiffs' Complaint shows that they are making the allegations of defalcation with regard to the Defendant's actions concerning the Superior Steel and Super Lift plans.[4] The Defendant's admission that he exercised such control/authority over the Superior Steel plan is enough to support a finding that he acted in a fiduciary capacity with respect to the trust.[5]

Courts have split on the question of whether acting in a fiduciary capacity under ERISA is co-extensive with acting in a fiduciary capacity under § 523(a)(4) of the Bankruptcy Code.[6] While the Second Circuit has not addressed this question, this Court finds the analysis in <u>Duncan</u> instructive. Looking to non-bankruptcy law to give meaning to Bankruptcy Code terms, the court found it "reasonable and appropriate to look to ERISA's definition of a fiduciary in order to assess whether the requirement of fiduciary capacity has been met" under § 523(a)(4), and held that "where the debt arises from an ERISA fiduciary acting in his or her fiduciary capacity under the statute, then Section 523(a)(4)'s requirement that the debtor acted in a fiduciary capacity will be met." <u>Duncan</u>, 331 B.R. at 82. <u>Accord</u> <u>Shephard v. O'Quinn (In re O'Quinn)</u>, __

---

[4] Even so, the following facts culled from the Complaint have been admitted as true with regard to Super Lift: the Debtor failed to make required contributions to the Trustees, failed to pay wages as dictated in the CBA, failed to make appropriate ERISA fund contributions to the Trustees, and intermingled funds and other assets with Superior Steel (doc. # 10).

[5] The Court emphasizes that its ruling that the Defendant acted in a fiduciary capacity arises from his admissions concerning his control over the plan and authority in the administration of the plan, <u>not</u> on the ground that he exercised any authority or control respecting disposition of the plan assets.

[6] The Ninth Circuit, in <u>Blyer v. Hemmeter (In re Hemmeter)</u>, 242 F.3d 116 (9th Cir. 2001), held that ERISA plan fiduciaries are always fiduciaries pursuant to § 523(a)(4) because "ERISA satisfies the traditional requirements for a statutory fiduciary to qualify as a fiduciary under § 523(a)(4),"<u>id.</u> at 1190, given that the statute defines the trust res and identifies the trustee's fiduciary capacities. On the other hand, the Sixth and Eighth Circuits have held that being an ERISA fiduciary is not sufficient, in and of itself, to satisfy the fiduciary capacity element of § 523(a)(4). <u>See</u> <u>Hunter v. Philpott</u>, 373 F.3d 873, 875 (8th Cir. 2004) (opining that Supreme Court and prior Eighth Circuit holdings require examination of the property alleged to be defalcated in order to determine whether defendant was obligated to hold that specific property for the benefit of the funds); <u>Board of Trustees of Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)</u>, __ F.3d __, 2007 WL 1891736 at * 5 (6th Cir., July 3, 2007) (citing previous Sixth Circuit cases construing 'fiduciary capacity' in § 523(a)(4) more narrowly than under ERISA, and agreeing with <u>Hunter</u> that a court should "examine the substance of the alleged fiduciary relationship to determine if the requirements of defalcation are satisfied."). <u>See also</u>, Liotta, "ERISA Fiduciaries in Bankruptcy: Preserving Individual Liability for Defalcation and Fraud Debts under 11 U.S.C. § 523(a)(4)" 22 <u>Emory Bankr. Dev. J.</u> 725 (Spring 2006) (arguing, <u>inter alia</u>, that <u>Hunter v. Philpott</u> should not be followed).

B.R. __, 2007 WL 2298240 at * 6 (Bankr. M.D.N.C. Aug. 9, 2007); General Produce Inc. v. Tucker (In re Tucker), 2007 WL 1100482 at *4 (Bankr. M.D.Ga. Apr. 10, 2007); Eavenson v. Ramey, 243 B.R. 160, 165-66 (N.D.Ga. 1999); Weaver v. Weston (In re Weston), 307 B.R. 340, 343 (Bankr. D.N.H. 2004); Harsch v. Eisenberg (In re Eisenberg), 189 B.R. 725, 730 (Bankr. E.D.Wis. 1995); Morgan v. Musgrove (In re Musgrove), 187 B.R. 808, 814 (Bankr. N.D.Ga. 1994). But see Bowman v. Hollander (In re Hollander), 1992 WL 373172 at *3 (N.D.Ohio May 25, 1992) (declining to apply ERISA definition of fiduciary to § 523(a)(4), while at the same time recognizing that ERISA governed the agreement at issue).

Here, the Defendant – who also served as president, secretary, and director of Superior Steel – admitted that he "was in control of the employee pension plans of Superior Steel, and had discretionary authority in the administration of the plans of Superior Steel" (doc. # 183). He served in an ERISA fiduciary capacity with regard to the Funds and, following the extensive analysis in Duncan, and considering the Defendant's control and authority over the plan in functional terms, the Court therefore finds that he also acted in a fiduciary capacity for purposes of § 523(a)(4). Accordingly, the Plaintiffs have satisfied the second prong of the dischargeability analysis.

### C.    Was the Transaction in Question a Defalcation Under Bankruptcy Law?

The final prong that the Plaintiffs must prove, by a preponderance of the evidence, is that the Defendant committed a "defalcation" within the meaning of the Bankruptcy Code. Unfortunately, the Code does not define this term and, as a result, courts have come to different conclusions as to what kind of misconduct must be shown in order to establish that the debt arose from a defalcation.[7]

On September 6, 2007, in Denton v. Hyman (In re Hyman), __ F.3d __, 2007 WL 2492789 (Sept. 6, 2007), the Second Circuit cleared up seventy years of confusion regarding the showing that must be made in this Circuit for behavior to constitute defalcation.[8] In Hyman, the Court surveyed other circuits – where defalcation ranged from innocent mistake to some level of wrongful conduct – and aligned itself with the holding in In re Baylis, 313 F.3d 9 (1st Cir. 2002), where the First Circuit ruled that a showing of conscious misbehavior, or extreme recklessness "akin to the level of recklessness required for scienter [in securities

---

[7]  Black's Law Dictionary defines defalcation as "1. embezzlement. 2. Loosely, the failure to meet an obligation; a nonfraudulent default. 3. Archaic. A deduction; a setoff." Black's Law Dictionary (8th ed. 2004).

[8] The confusion began with Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510 (2d Cir. 1937), when Judge Learned Hand attempted to define defalcation in the context of a bankruptcy discharge. Judge Hand wrote that the term had first been included in the Bankruptcy Act as early as 1841where it may have had a colloquial meaning, given that it "ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts." Id. at 511. Given the evolution of the statute, and its placement along with the words fraud, embezzlement, and misappropriation in the then-current statute, Judge Hand sought to separate the meaning of defalcation from those words by citing an earlier case, In re Bernard, 87 F.2d 705 (2d Cir. 1937), where the Second Circuit held that "misappropriation" involved a known breach of the duty, and not mere negligence or mistake. See id. at 707. Judge Hand reasoned that misappropriation carried a larger implication of misconduct than defalcation, and assumed arguendo, that "defalcation may demand some portion of misconduct." Central Hanover, 93 F.2d at 512.

law]" was required, a degree of fault "closer to fraud, without the necessity of meeting a strict specific intent requirement." Id. at 18-19, 20. The Hyman Court echoed this standard, holding that

> defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness – a showing akin to the showing required for scienter in the securities law context. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000); Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000); Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999).[9]

Hyman, 2007 WL 2492789 at *6. The Court went on to say that this standard struck a proper balance where "defalcation" would complement but not dilute the other terms found in § 523(a)(4) – fraud, embezzlement, and larceny, all of which required "a showing of actual wrongful intent," and at the same time reserved "the harsh sanction of non-dischargeability . . . for those who exhibit 'some portion of misconduct.'" Id. (quoting Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510, 512 (2d Cir. 1937).

The three securities law cases cited in Hyman elucidate the requisite scienter. "The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud' or knowing misconduct." Press, 166 F.3d at 538 (quoting S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)). This requisite "intent can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Ganino, 228 F.3d at 168-69 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

In this case, the conduct that the Plaintiffs complain was committed by the Defendant is more akin to "knowing misconduct" and "conscious misbehavior" than "recklessness." The Complaint alleges that the Defendant "fraudulently withheld funds he deducted from employees' pay checks which were to be forwarded to the Trustees o[f] Local 474" and this constituted defalcation.[10] In their brief, the Plaintiffs cite In re Ansari, 113 F.3d 17 (4th Cir. 1997), for the proposition that "misappropriation of trust funds or money held in a fiduciary capacity, or failure to account for such funds" constitutes defalcation. They then argue that the CBA required Mayo to withhold money from employee wages and to contribute those funds to a trust, and that instead of fulfilling this duty, the Defendant used that money for personal and other business uses. They conclude that his "failure to withhold such funds, his failure to properly account for them and his failure to make the required distributions to the trust, commingling them with other funds, constitutes defalcation" (doc. # 178 at p. 9).

The Defendant signed the CBA which incorporated the Local Agreement; the Local Agreement

---

[9] Twenty years ago, this Court ruled that defalcation required "no intent, no misconduct, no personal gain, nor does it allow for ignorance," and encompasses situations where fiduciaries, for any reason "were short in their accounts." Lavigne v. Rudd (In re Rudd), 1987 WL 19488 at *3 (Bankr. D.Vt. Sept. 29, 1987). In light of Hyman, the Rudd standard has been superseded.

[10] The allegation of "fraud" was not admitted as true upon the granting of the default judgment, given that it is a legal conclusion.

provided that he, as an Employer, would withhold from wages certain amounts per hour of employee work which would be paid to the vacation fund; and would pay certain amounts per hour into the pension fund and the welfare fund. He also initialed "Proposal 3" – changes to the CBA – which indicated that $.30/hour would be withheld for the pension fund in March 2002; increased the vacation deduction "to $.50 as of 9/16/01" and provided that "[a]s of January 1, 2002 all benefits, assessments, etc. will be paid by a pre-paid stamp or voucher purchased by the contractor" (doc. # 181). The Defendant had a fiduciary duty – qualitatively different from a contractual duty – to remit that money, collected for the benefit of the workers, into the Funds. It is undisputed that the Defendant did not pay into the various Funds the money that the CBA and the Local Agreement required him to withhold from wages or contribute to the Funds. While the Plaintiffs have provided no evidence showing how the Defendant used the money that he failed to contribute to the Funds, that failure is not dispositive here. The Court accepts as true the statement in the Complaint that Super Lift and Superior Steel "have intermingled funds and other assets" (doc. # 10, ¶ 20), which shows that Mayo improperly "commingled" the money he collected that should have been remitted to the Funds. Because the Defendant signed the CBA and initialed Proposal 3, he is charged with the actual knowledge that he had a duty to pay certain amounts into the various Funds. In this Court's view, the Defendant's failure to make the requisite payments represents a material and knowing breach of his fiduciary duty and constitutes the kind of "knowing misconduct" contemplated by the Second Circuit's new defalcation standard. See Baylis, 313 F.3d at 17 ("Inherent in 'defalcation' is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation."); Duncan, 331 B.R. at 87 ("Not every debt incurred by a fiduciary may arise as a result of a defalcation, but where the debt arises as a result of conscious misconduct or breach of the duty giving rise to the debtor's fiduciary status, the defalcation element of Section 523(a)(4) will be satisfied."). The Plaintiffs have therefore satisfied the third prong of the dischargeability analysis.

Since the Plaintiffs have established that the Defendant's conduct demonstrates the three elements of the defalcation dischargeability standard under § 523(a)(4) and the Hyman case, the Court finds that the Plaintiffs are entitled to a judgment declaring that portion of the default judgment attributable to the Defendant's defalcation, $181,258.00[11], excepted from discharge.

### III.    Did the Defendant Perpetrate a Willful and Malicious Injury?

The Plaintiffs assert that the Debtor perpetrated a willful and malicious injury on the Plaintiffs, pursuant to § 523(a)(6), "when he formed a company [Super Lift] for the sole purpose of avoiding his obligation to the Union under the CBA by paying cash to employees and to lure employees away from the union environment. As a result of the existence of the CBA, any employee who performed work for the Debtor were/are entitled to make claims for insurance, pension or other available benefits under ERISA

---

[11]   The Court arrives at this figure by deducting the amount awarded for attorney's fees, $27,279.22, from the total amount of

simply upon proof of employment, exposing the Creditors to liability and adversely scewing [sic] the pension funds actuary projections, designed to protect plan beneficiaries." (doc. # 178 at p. 3).

Section 523(a)(6) of the Bankruptcy Code provides that:

(a)    A discharge under section 727 [and certain other sections of the Code] does not discharge an individual debtor from any debt –
       * * *
       (6)    for willful and malicious injury by the debtor to another entity or to the property of another entity.

§ 523(a)(6). The statute is written in the conjunctive; it requires the Plaintiff to show that the acts or conduct of the Debtor were both willful and malicious, although the Code defines neither term. In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court explained that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury," id. at 61, and likened such an injury to intentional torts that "generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" Id. at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)(emphasis added)).

Here, the Plaintiffs have provided no evidence of any intent on the part of the Defendant to support a finding of "willful and malicious injury." The Plaintiffs conclusorily assert that the Defendant formed Super Lift for the purpose of avoiding payment of worker benefits, but point to no evidence in the record to support this theory. Accordingly, the Plaintiffs are not entitled to a judgment declaring the subject debt to be excepted from discharge on this ground.

**IV.    Other Arguments**

The Defendant has argued that the Plaintiff's motion for summary judgment is untimely (having been filed ten days after the due date set in the scheduling order, see doc. # 176) and must be denied on that ground. The Court cannot help but observe the irony of a timeliness argument being advanced by the Defendant who, having missed numerous discovery deadlines set by the Court, was ultimately sanctioned for failure to comply with Court orders. However, that does not affect the Court's adjudication of the argument. On the merits, the Court finds the Defendant has presented no proof that he was in any way prejudiced by the Plaintiffs' tardiness in filing their motion for summary judgment.  Accordingly, the Court rejects this argument as being without merit.

## CONCLUSION

For the reasons cited above, the Court makes the following findings.  First, the Plaintiff has established that the Defendant's conduct constitutes "defalcation while acting in a fiduciary capacity" under the Bankruptcy Code, and thus, the portion of the default judgment entered against the Defendant as a result

_____

the judgment, $208,537.22.

of his failure to comply with the CBA, $181,258.00, is excepted from discharge, pursuant to § 523(a)(4).

Second, the Court finds that the Plaintiffs have not sustained their burden of proof on the claim for attorney's

fees and therefore the portion of the default judgment attributable to attorney's fees, $27,279.22, is not

excepted from discharge. Lastly, the Court finds that the Plaintiffs' have not sustained their burden of proof

on the "willful and malicious injury" claim and hence will not declare the exception to discharge to be

founded on the additional ground set forth in § 523(a)(6).

  This constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered.

September 17, 2007                 Colleen A. Brown
Rutland, Vermont                 United States Bankruptcy Judge